FILED

01/15/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 1, 2020

## STATE OF TENNESSEE v. BRIAN HOWARD

**Appeal from the Criminal Court for Shelby County
Nos. 18-07085, C1810330   James M. Lammey, Judge**

_____

### No. W2020-00207-CCA-R3-CD

_____

Brian Howard, Defendant, was indicted for one count of second degree murder, one count of convicted felon in possession of a firearm, one count of attempted second degree murder, and one count of employing a firearm during the commission of a dangerous felony.  A co-defendant, Quinton Brown, was also indicted for his role in the offenses and the two were tried together.  Defendant asked the trial court to bifurcate the possession of a firearm by a convicted felon count prior to trial.  The trial court denied the motion.  After a jury trial, Defendant was convicted of the lesser-included offenses of voluntary manslaughter and attempted voluntary manslaughter as well as possession of a firearm by a convicted felon and employing a firearm during the commission of a felony as charged in the indictment.  Defendant was sentenced to an effective sentence of 67 years, to be served consecutively to a fifteen-year federal sentence.  After the denial of a motion for new trial, Defendant appeals to this Court arguing that the trial court erred by denying the motion to bifurcate the possession of a firearm by a convicted felon charge and that the evidence was insufficient to support the convictions where the proof indicated that Defendant acted in self-defense.  For the following reasons, we affirm the judgments of the trial court but remand the matter for correction of the judgment form in Count 4 to reflect that the conviction for employing a firearm during the commission of a felony is a class C felony.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Juni Ganguli, Memphis, Tennessee, for the appellant, Brian Howard.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephanie Johnson and Justin Prescott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

During the summer of 2017, both Lakendra Caradine and Shakara Alsobrooks were in a relationship with Defendant. Ms. Caradine was not thrilled with the polygamist nature of the relationship and decided to move out of the house they lived in together. She arrived at the house in her car around 10:30 p.m. on the night of July 20 to pack up her belongings and move out.

Defendant was at home when Ms. Caradine arrived. The two got into an argument while Ms. Caradine packed her belongings. At some point during the argument, Defendant and Ms. Caradine were "going back and forth over a tote and [Defendant] hit [her]." Ms. Caradine immediately called her brother, Bobby Caradine and asked him to come to the house and help her pack her things.

When Ms. Caradine called her brother, Bobby Caradine, he was arguing with his girlfriend, Okecia Wickfall. Ms. Caradine was afraid that he would not come to help or would take too long to get there, so she called her cousin, the victim, Phillip Carr. Mr. Carr told Ms. Caradine that he was on his way, so she went outside and waited in her car for him to arrive.

While Ms. Caradine waited for someone to arrive to help her, Defendant brought some of her clothes out to the car and placed them in her trunk. Mr. Caradine showed up shortly thereafter. He was accompanied by Ms. Wickfall and Tiffany Kelly, Ms. Wickfall's aunt. Mr. Caradine got out of his car and helped move Ms. Caradine's things into her car. Defendant stood on the sidewalk talking on the phone. Mr. Caradine did not know Defendant before that night. He asked Ms. Caradine if Defendant was "that N**** right here" on the sidewalk. Ms. Caradine responded affirmatively. She could tell that her brother was "ready to fight" Defendant. She described Mr. Caradine as "mad" and "upset." Mr. Caradine acknowledged that he was angry with Defendant for hitting his sister. Defendant and Mr. Caradine did not argue, but Defendant told Mr. Caradine to mind his own business. Defendant yelled at Ms. Caradine angrily as she walked back into the house to retrieve more belongings.

When Ms. Caradine emerged from the house again, Quinton Brown "pulled up" in a vehicle, got out, and gave Defendant a gun. Ms. Kelly saw Defendant "put[] the gun in

his pants." Ms. Kelly saw the exchange and described the weapon as a "heavy, heavy gun" with a "huge barrel." Mr. Caradine also saw Mr. Brown deliver the gun to Defendant.

Mr. Carr pulled up in his vehicle about the time that Mr. Caradine was getting ready to leave. He was accompanied by his girlfriend, Tynesha Richmond, and Jamal Reed, one of Mr. Carr's coworkers. Ms. Richmond was pregnant with Mr. Carr's baby. She described Mr. Carr as agitated at the thought of Defendant's treating his cousin poorly. Mr. Carr was armed with a handgun when they arrived. Mr. Caradine testified that he told Mr. Carr to leave because Defendant had "a 30."

Once at Defendant's house, Mr. Carr got out of his vehicle and, according to Ms. Richmond, Mr. Carr started "arguing, yelling at [Defendant] and [Defendant] was arguing back with him." Ms. Richmond explained that the two men "had had previous altercations." Mr. Caradine said that the men had "some words." Mr. Carr had a gun in his hand and held it "down by his side." Mr. Carr was saying, "I'ma die by mines," meaning that he was there for his family.

Ms. Caradine told everyone that it was time to leave. Mr. Caradine backed up and left in his vehicle. Ms. Caradine followed behind him in her car. Mr. Carr's vehicle pulled away from the house last. Ms. Richmond was in the passenger seat of Mr. Carr's vehicle. She saw Defendant and Mr. Brown walk toward the middle of the yard. Mr. Carr stopped his vehicle and "hop[ped] out immediately" with the gun in his hands. Mr. Carr told Defendant not to shoot at the car because Ms. Richmond was pregnant. Ms. Richmond explained that Mr. Carr told Defendant he was licensed to carry his gun and would use it if he needed to do so. According to Ms. Richmond, the men were shouting at each other shortly before a gunshot came from the direction of the house toward Mr. Carr's vehicle. Shortly after the incident, Ms. Richmond identified Defendant as the first shooter. At trial, she testified that she did not know who fired the first shot but that Mr. Carr did not fire first. Ms. Richmond saw Mr. Carr shoot his gun before "consistent gunfire" erupted. She thinks that she heard as many as 15 shots during the "rapid fire." Ms. Wickfall stated that Mr. Caradine did not have a gun.

Jamal Reed was seated in the rear seat of Mr. Carr's vehicle that night. He worked with Mr. Carr at Walmart and rode home with him from work that night. Mr. Reed described the events consistently with the testimony of Ms. Richmond, stating that Mr. Carr only started shooting "after he was getting shot at." Mr. Reed testified that he heard the first shot before Mr. Carr started shooting. Mr. Reed remembered seeing sparks coming toward him, hitting the ground. Mr. Carr got back in the vehicle and started to drive away before he was shot and killed. Ms. Richmond was grazed in the leg by a

bullet and Mr. Reed was shot in the back. Ms. Richmond was able to stop the car before she or Mr. Reed were injured.

Mr. Caradine saw Mr. Carr and Defendant shooting at each other. He heard more than 20 shots in total. Just prior to the gunfire, Ms. Caradine drove "[t]owards the stop sign" and made a right turn. She heard "a lot" of gunshots. Ms. Caradine was not able to discern who was doing the shooting. She quickly made a U-turn and saw Ms. Richmond trying to gain control of the vehicle driven by Mr. Carr. Ms. Caradine arrived at the vehicle and "[Ms. Richmond] handed [her] the gun" which she took to her car. Ms. Caradine later gave the gun to Ms. Richmond, who placed it in a safe. Eventually, the gun was turned over to Memphis Police Department.

Ms. Kelly heard the shooting begin but did not know from which direction the shots originated. She thought that the majority of the shots came from the direction of Defendant's house. The shots seemed "nonstop" and sounded like they were getting closer. Ms. Wickfall thought that the gunshots came from two directions. Once they heard the gunshots, Mr. Caradine stopped his car, and had one foot outside his car, yelling at Mr. Carr in an attempt to calm him down. Mr. Caradine got back into his car and drove off. He returned to the scene when he heard sirens. Ms. Kelly, a nurse, approached the vehicle and verified that Mr. Carr was deceased. The victim died as a result of a bullet wound to the right side of the chest. The bullet was recovered from the left lung.

When police arrived at the scene, they found evidence that multiple gunshots were fired from Defendant's yard. They also found holes in both Mr. Carr's and Mr. Caradine's vehicles. The Tennessee Bureau of Investigation determined that the bullets and cartridge cases at the scene were fired from two different firearms, a pistol that was provided to police and an unknown firearm. The bullet recovered from the victim's body was fired from the unknown firearm.

Neither Defendant nor codefendant Brown testified or presented additional proof.

At the conclusion of its proof, the State read a stipulation regarding Defendant's two prior felony convictions. The stipulation read that Defendant had been convicted, as set out in Count 3 of "criminal attempt aggravated burglary, a felony, involving the use or attempted use of violence, on January 8, 2009, . . . and criminal attempt aggravated burglary, a felony involving the use or attempted use of violence on January 8, 2009."

The jury was instructed on the stipulation as follows:

If you find from the proof that the defendant has been convicted of another crime or crimes other than that for which he is presently on trial, you may

- 4 -

not consider such evidence as proof of his disposition to commit the crimes for which he is on trial.

At the conclusion of their deliberation, the jury found Defendant guilty of the lesser-included offenses of voluntary manslaughter and attempted voluntary manslaughter, as well as possession of a firearm by a convicted felon and employing a firearm during the commission of a felony as charged in the indictment. Defendant was sentenced to an effective sentence of 67 years, to be served consecutively to a fifteen-year federal sentence.

Defendant filed a motion for new trial which was denied by the trial court. A timely appeal followed.

*Analysis*

On appeal, Defendant first argues that the trial court erred by failing to bifurcate his charge on the felon in possession of a firearm count. Specifically, Defendant argues that bifurcation was necessary to avoid undue prejudice. The State disagrees, pointing out that the trial court was not required to bifurcate the charge and, in any event, that Defendant was not prejudiced by the trial court's failure to do so.

As pertinent to our review, Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence" or an "attempt to commit a felony crime of violence." There was no dispute that Defendant had qualifying prior felony convictions for attempted aggravated burglary.

This Court has referred to bifurcation as "the better procedure" when "the defendant is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction." *State v. Foust*, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015). Furthermore, this Court has recognized that a trial court may order bifurcation upon concluding that a bifurcated proceeding is "necessary 'in order to avoid undue prejudice.'" *State v. Brandon Johnson*, No. W018-01222-CCA-R3-CD, 2019 WL 6045569, at *13 (Tenn. Crim. App. Nov. 14, 2019), *perm. app. denied* (Tenn. Apr. 1, 2020) (quoting *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009)). Nevertheless, this Court has continued to hold that bifurcation is not mandated. *See id.*; *State v. Tavares Dewayne Buchanan*, No. M2017-02268-CCA-R3-CD, 2019 WL 852192, at *6 (Tenn. Crim. App. Feb. 21, 2019), *perm. app. denied* (Tenn. Apr. 11, 2019); *State v. Stephan Richardson*, No. W2016-02227-CCA-R3-CD, 2018 WL 821775, at *16 (Tenn. Crim. App. Feb. 9, 2018); *State v. Timothy Damon Carter*, No. M2014-01532-CCA-R3-CD,

2016 WL 7799281, at *27 (Tenn. Crim. App. Mar. 8, 2016), *overruled on other grounds by State v. Menke*, 590 S.W.3d 455, 468 (Tenn. 2019).

In *Foust*, the defendant argued that the trial court had not allowed him to offer the stipulation that he had been convicted of prior felonies without disclosing that the felony was for a violent offense. 482 S.W.3d at 46-47. The State argues that this case is distinguishable from *Foust*. We agree with the State.

Here, the parties entered into a stipulation at trial. "[S]tipulating to prior felonies and requesting bifurcated proceedings are both valid avenues for a defendant charged with possession of a firearm as a convicted felon." *Brandon Johnson*, 2019 WL 6045569, at *14 (citing *State v. Carlos Smith*, No. W2012-01931-CCA-R3-CD, 2013 WL 12182606, at *4 (Tenn. Crim. App. Aug. 29, 2013)); *see Stephan Richardson*, 2018 WL 821775, at *16. Further, unlike the prior felonies in *Foust*, Defendant's previous convictions for attempted aggravated burglary are dissimilar to the current charges against Defendant. Additionally, the trial court instructed the jury that it may consider the stipulation only as it related to the elements of possession of a firearm by a convicted felon and for no other purpose. The trial court in this case properly instructed the jury, and the jury is presumed to have followed the instructions of the court. *See State v. Martin Boyce*, No. W2012-00887-CCA-R3-CD, 2013 WL 4027244, at *12 (Tenn. Crim. App. Aug. 6, 2013), *no perm. app. filed* (citing *Banks*, 271 S.W.3d at 134; *see* Tenn. R. Crim. P. 14(b)(2). Moreover, our supreme court has held that, with respect to status offenses, like the unlawful possession of a handgun offense at issue here, "specific reference[s] to [a] defendant's prior felonies" are "relevant to establish an essential element of the crime for which the defendant is being tried." *State v. James*, 81 S.W.3d 751, 760-61 (Tenn. 2002)); see also *Foust*, 482 S.W.3d at 47. We conclude that the trial court did not err in denying Defendant's motion to bifurcate the felon in possession of a firearm count of the indictment. Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Defendant argues that the evidence is not sufficient to support his convictions for voluntary manslaughter, attempted voluntary manslaughter, and employing a firearm during the commission of a dangerous felony because he acted in self-defense. The State insists that the evidence was sufficient.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with

one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Id.* (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). Therefore, the prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

"Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). One is guilty of attempted voluntary manslaughter when he acts "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2). Voluntary manslaughter is considered a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002). "If an offense is defined in terms of causing a certain result, an individual commits an attempt at the point when the individual had done everything believed necessary to accomplish the intended criminal result." T.C.A. § 39-12-101, Sent. Comm'n Cmts. A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). The question of whether a killing or attempted killing is committed under adequate provocation is a question of fact for the jury. *State v. Johnson*, 909 S.W. 2d 461, 464 (Tenn. Crim. App. 1995).

It is an offense to employ a firearm during the commission of a dangerous felony or the attempt to commit a dangerous felony. T.C.A. § 39-17-1324(b)(1)-(2). Voluntary manslaughter and attempted voluntary manslaughter are specified as dangerous felonies in Tennessee Code Annotated section 39-17-1324(i)(1)(C), (M).

Tennessee Code Annotated section 39-11-611(b) provides that:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b). This belief must "meet an objective standard of reasonableness to be justified," and "the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." *State v. Bult*, 989 S.W.3d 730, 732 (Tenn. Crim. App. 1998). However, if the person was engaged in an unlawful activity, like possession of a firearm by a convicted felon, there is a duty to retreat prior to using deadly force. *See State v. Perrier*, 536 S.W.3d 288, 294-401 (Tenn. 2017). Once a defendant has raised sufficient facts to support that his actions were in defense of himself, the State must put on "proof to negate the defense exists." T.C.A. § 39-11-201(a)(3); *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001) (citing *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)).

In a light most favorable to the defense, the proof at trial was that Defendant shot Mr. Carr. There was no direct proof as to who shot Mr. Reed. The evidence indicated that multiple shots were fired from the direction of Defendant's porch toward the location of Mr. Carr's vehicle. Mr. Reed was shot in the back while he was seated in the rear seat of Mr. Carr's vehicle. The vehicle was driving away from the scene at the time. There was evidence of anger between Defendant and Mr. Carr leading up to the gunshots. There was testimony that there were heated arguments between Defendant, Mr. Caradine, and Ms. Caradine before Defendant called Mr. Brown to bring him a weapon. Multiple witnesses saw Mr. Brown give Defendant a gun. Defendant was, admittedly, a convicted felon who had a duty to retreat prior to the use of deadly force. Despite this, Defendant

did not retreat.  As Mr. Carr was driving away, Defendant walked toward him with his gun in his hand.  Testimony from several witnesses indicated that Defendant fired the first shots.  The jury was charged with self-defense and rejected it.  In our view, the evidence was sufficient for the jury to reject Defendant's claim of self-defense and find Defendant guilty of voluntary manslaughter, attempted voluntary manslaughter, and employing a firearm during the commission of a dangerous felony.  Defendant is not entitled to relief on this issue.

## *Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.  The matter is remanded to the trial court for entry of a corrected judgment form in Count 4 to reflect that the conviction for employing a firearm during the commission of a dangerous felony is a class C felony.

_____
TIMOTHY L. EASTER, JUDGE